The final case this morning is Gums v. HHS. Mr. Lutz. Good afternoon, Your Honors. May it please the Court. I'm here today on behalf of Dr. Heidi Gums, who after 21 years of dedicated service, unblemished record, and outstanding performance working for the Indian Health Service, was terminated from his position. Let me ask you, Mr. Lutz, a question about Oklahoma law, which hasn't been addressed in the briefs yet. As I understand it, the agency's concern and the MSPB finding is that your client's activity after May 7th, I guess it was, was criminal, I guess under Oklahoma law. But I'm not sure that's true. There's an Oklahoma statute which says that if a license is up for renewal and there's a timely application for renewal, that the license continues until the renewal is acted upon, which might suggest that under Oklahoma law, it is not criminal to continue to practice medicine after your license term has expired so long as you have made a timely application for renewal. So perhaps the agency's assumption about, well, the agency's assumption about all 50 States being criminal is absolutely incorrect. But what's your comment on that? Well, Your Honor, my point, I... Just so that you know what the site is, it's Title 75, Section 314B of the Oklahoma statute. My understanding is that physicians working for the Indian Health Service must be licensed in a State or other, I guess, commonwealth jurisdiction or District of Columbia. But clearly, the... What I would term almost gratuitous references in the record is that, and of course it's illegal, of course it's illegal. One of my concerns... It has to be legal under Oklahoma law because that's where the services are provided. Exactly. So if under Oklahoma law, a license continues when there's a renewal pending, then it would seem as though it's not illegal, it's not criminal under Oklahoma law. Are you familiar with that provision? I apologize. I am not familiar with that particular provision. I could certainly file some supplemental material at the court on the subject. But the underlying point of the assumption that was made by the deciding official, that one of the reasons that he considered the gravity of the offense, and one of the reasons that he decided that he was not even going to consider a lesser penalty due to the gravity of the offense that was alleged, was the concept that what had happened was that he had illegally practiced medicine when he saw that one patient on that one day during the period that his license was being renewed, but prior to the time that it had actually renewed. And there is an important distinction in that his license was up for renewal, not reinstatement. The concept of just simply not bothering to renew your license, or not diligently pursuing that, or if I as an attorney were to put a check in the mail to the DC bar and the check for some reason didn't reach there, didn't reach it in time, and I was administratively warned or suspended or something, those are not the equivalent of practicing law without a license or practicing medicine without a license. He was qualified. He was licensed in Puerto Rico. There was this administrative delay that caused, and the record is very clear, he had started the process. He knew he wasn't licensed. He knew his license had lapsed at the time he saw that patient. He did in fact ask that morning. So like this morning, if you would receive notice from whatever state you're barred in, New York bar, that your license has lapsed effective today for non-payment of bar dues, not because you were for some reason not in good standing or otherwise qualified to be a lawyer, but you simply hadn't paid. Would you have come to court today, shown up and stood at that podium and tried to argue on behalf of your client, even though you knew your law license had lapsed? You knew you could easily fix it, but you hadn't yet fixed it. Would you come to court today and stand at that podium and proceed to represent your client? I would not, but you know the difference with Dr. Gumbs here is that he didn't have the affirmative knowledge. He was operating from a voice. Shouldn't he have assumed that because he'd been told, as the record is clear, he'd been told the week before, that it should be out any day now. We expect it's in process of being out. Where does it say in the record it's going to be out any day now? As I read the record, or as I understood the record, it wasn't clear when he was going to get the renewal from Puerto Rico. He was in the process of trying to work it out with them, but there wasn't any indication that it's coming, it's coming. It's just sit by the fax machine, here it comes. I didn't see anything like that. Well, I believe, and I apologize that I do not have a record citation for it right now. I believe in the record there's testimony by Dr. Gumbs that as of the week before, which incidentally is also the time in which he sat down with the credentialing officer at his clinic and informed as well Dr. Sanders, who was the media supervisor, that as of that day previous to the incident, the May 8th, one patient that he saw, he informed them that at that point he had not received that confirmation. And I believe it was in the context of that discussion that he also stated that he was expecting it to come any day. And that he had had communication. It's not a situation where he just sent it in and waited for something to happen. I will tell you, to answer the court's question more directly, if I sent in my check and didn't hear anything to the negative, I would assume that I was renewed. Okay, but he, all right. Where exactly was he practicing? I'm trying to understand. Is he on an Indian reservation? Yeah, my understanding is the clinic is on a 20 Indian reservation. And is it true that state law is not applicable on Indian reservations, that they are their own sovereign? Well, my understanding is that the licensure authority of professionals on Indian reservations does track the state law. And I can, again, this is not something I was prepared for today, and I apologize. I can certainly supply a supplemental argument of authority on that point as to the exact jurisdiction. Certainly with federal government, for physicians just as with attorneys, being licensed in a jurisdiction is sufficient. Was he licensed in any jurisdiction? Only Puerto Rico, and that's one that's an issue here. So the question, it seems to me, primarily is not whether he could be sanctioned for what he did if, in fact, under Puerto Rico law, the license lapsed. I don't know whether they have a provision like Oklahoma's or not, but assuming they don't, the question is whether he should be removed for that or whether some lesser discipline would be appropriate. And what the agency and the MSPB relied on was the notion that this was criminal, that it's criminal under Oklahoma law. And it seems as though perhaps it was not criminal under Oklahoma law because of this provision that I read to you. So maybe there's an issue as to whether removal based on alleged criminal activity is appropriate under these circumstances. Well, and a point of fact, we made that point of reach in a slightly different manner, which is the fact that in considering lesser remedies, it is, in fact, a criteria for the job that one be licensed. That's understandable. That's part of their contract. That's part of their bylaws under which he operates. But when one goes to the seriousness of the offense, which is really the primary criteria upon which the government relies in the termination, the seriousness of this offense, when one peels back the engine just one layer to look at what they say is so terribly serious, we find the deciding official saying, well, I'm not going to even consider lesser, in the record, I'm not going to consider lesser penalty because the offense was so terribly serious, because it might have reflected poorly on our services and it might have led to potential liability having committed a malpractice and it might have done a lot of other things, all of which is on these fact-specific issues, it really is speculation. Now, the adjudication... Well, I'm just hypothetical. If you came here today having sent in your money for your bar renewal and argued a case before the renewal actually became effective and assuming there wasn't a provision such as I promised to question, the analogy would be should you be disbarred for appearing in court or should you be disciplined in some other way for doing this? And in point of fact, had there been, which of course there never were, any disciplinary proceedings from any medical authority brought against Dr. Gumbs, those are exactly the issues that would have been... It seems to me the analogy is not should you be disbarred, isn't it? Should your law firm be entitled to fire you given that you did that, that you exercised poor judgment in not knowing that your license had not been renewed and went in without telling anyone and practiced in court? No one has disqualified him from the practice of medicine. Has the federal government done that? No. No. So he's entitled to practice medicine. He's just not entitled to do so as a VA doctor. That is correct. The standard of review is abuse of discretion. Well, abuse of discretion, there must be substantial evidence. But if there's substantial evidence to support the two allegations of misconduct, then on the question of the penalty and the Douglas factors, it's an abuse of discretion standard, right? Yes. Whether the choice made is within the tolerable limits of reasonable. And that's exactly right in the end. In fact, it's not exactly right because if the penalty rests on the notion that the activity is criminal and it's not, that's not reviewed for abuse of discretion. And we recently held that under such circumstances where they make a mistake about the activity being criminal, it has to be sent back. That's a clearly erroneous finding or an error of law. They don't have discretion to say we're doing it because it's criminal when it's not. Thank you, Your Honor, for filling in my next sentence. It has to be in accordance with the law. And it is our position, as we've argued as well, that this particular determination is not in accordance with the law and that the Douglas factors, it's not enough just to recite them and say, here are the Douglas factors and here's a response to each of them. They actually have to be applied and they have to be applied correctly. Which one did they get wrong? Well, where do you start? They certainly started in the nature and seriousness of the offense. Because the nature and seriousness of the offense in this case was, on each of the two charges, in the first instance, the nature and seriousness of the offense was that he had applied in February for a renewal of his Puerto Rican medical license that had not yet happened. And to the extent that government still contends that part of that offense was in not telling the supervising physician that morning that nothing had changed since the Friday before when he had told them it hadn't done that. Dr. Gumbs, in his testimony, I think accepted responsibility for that. He said, shouldn't you have gone and told your supervisor, yeah, I probably should have. I read the record of him working to shift the blame to the supervisors and to the nurses and blaming everybody else except himself for electing to provide medical care to a patient that morning. Our argument to the extent that, and certainly the MSPB took it as a shifting of blame as well, our argument today is not that it's anybody's responsibility other than Dr. Gumbs to maintain his credential, although they do have a credential office and others to assist in that process. The argument goes to the seriousness of the offense in the fact that he did not conceal this. He did not do it for malicious purposes. All he did that morning was he came in and he started his assigned rounds that were on the schedule without stopping that morning and saying, wait a minute, I know this is my job. I know this is what I've been assigned to do. I can't do this because I don't have my renewal in hand yet. This happened once before with Dr. Gumbs, right, six years prior. I'm glad you raised that question. There is evidence that once before there was a delay in the renewal process. And then he sat out during that time. And then he did, in fact, sit out during that time. There are no disciplinary charges brought at that time. There was no hint of any disciplinary charges at that time. There's nothing in the record to show any disciplinary charges. Well, at least he wasn't providing medical care to patients during that time. That would be the distinction, that he did not see the one patient. But, again, I want to be clear. It's not Dr. Gumbs' position that it's somebody else's fault that he saw that patient that morning. What Dr. Gumbs' position, the reason that it's so important that he kept his superiors and the credentialing officer aware of the fact that his license was still pending renewal, is that he did not, it's not a situation where he concealed anything, where he pretended to be a doctor, where he pretended to be licensed and wasn't. He kept them apprised of the situation every step of the way. And if there is a fault to Dr. Gumbs for having seen that one patient that morning, and I would also argue that Dr. Sanders quite appropriately, you know, took steps to mitigate any potential risk to the clinic by reviewing those notes and by himself signing off on it after Dr. Gumbs had completed it. But if his offense, if seeing that one patient while his license was pending, then the rational and reasonable response to that offense, which is not capable of repetition, at least for the next six years, is not indicative of any pattern of behavior. And if anything, as Dr. Gumbs coming in wishing to do his job as a public servant that morning and do what he got paid to do, is not a termination offense. It is something where a far lesser penalty could and should have been imposed that would have satisfied whatever needs the agency might have legitimately perceived existed without terminating a blemishless 21 career as a physician working in an underserved community. Well, I think we're out of time. We'll give you two minutes for rebuttal. Mr. Grimaldi. So does Oklahoma law apply to practice of medicine here on this reservation? Well, Your Honor, I did look at Oklahoma law in preparation of our brief as well as the argument today. We did look at federal law or Puerto Rico law. Unfortunately, we found a different statute than the one that Your Honor cited. We found 59 Oklahoma Statute 495B, so that's 59495B, which does not have the qualifying language that Your Honor just stated. So if I can ask Your Honor to repeat that, did you state that if a pending application is with the board, then it won't be practicing medicine without the law? It says, except as otherwise prohibited by law, the licensee has made timely and sufficient application for renewal of a license. The existing license does not expire until the application has been finally determined by the agency. So the question, the discipline here rests on a finding of criminality. The question is whether under Oklahoma law, continuing to practice medicine with an expired license where the renewal has been put in is, in fact, a criminal offense. Well, the renewal I've been putting in, Your Honor, as of the morning of May 8, 2013, he still owed $100, which he did not place in until after he saw a patient. So even if this statute does apply, his renewal is not pending. It was not completed, if you will, Your Honor. And that can be seen on JA-95. So if he has made a timely and sufficient application, the sufficiency of the application is relied by the fact that he has not made payment. Correct. Okay. Hunter, poor wiggle, when's the payment supposed to be made? Oh, I believe with the application. That's kind of what was implied from all the testimony. I don't think there was anything in the record that says this is when it needs to be paid, but that's what was holding up his application was the fact that he had not paid the full amount. I just want to point out that, Your Honors, I guess we'll just turn directly to the Douglas factors here, Your Honors, and there's been discussion today about speculation here. All this harm is speculative. This amounts to almost – Well, the real question is the seriousness of the offense. This is not – I mean, he wasn't doing this for personal gain. He wasn't feeling the fact that he had made application and was having difficulty getting it done. And the question is whether, under the circumstances here, it was appropriate to remove him as opposed to some other form of discipline. Yes, Your Honor. And he was removed because it was a serious offense. As we've discussed, it's a criminal action. It also placed the clinic in jeopardy in the sense that the Joint Accreditation Commission standards, which allow them to be a nonprofit, it was a violation of that. There was testimony about that. Well, suppose that it weren't criminal. If this Oklahoma statute did apply and it weren't criminal, wouldn't we have to send it back for a redetermination of the penalty? Well, Your Honor, I would say that it was still a violation of the bylaws of the – Yes, but it rests on the criminality finding. The bylaws don't make criminality, right? No. Let me give you the exact language, Your Honor. It rests upon when we have the judge's factors print out that Mr. Scott, the deciding official, did under the first one, which is the nature and seriousness of the crime. J-85. That's correct. But the bylaws don't make it criminal, right? No, but it's a violation of – he says, which is a violation of laws which govern and regulate patient care. You know, this wouldn't be – the bylaws aren't a law applicable to every doctor in Oklahoma, but they apply to Dr. Jones. He wasn't fully accredited. But what's – since the decision of the deciding official and the MSPB rested on a finding of criminality, if it weren't criminal, we'd have to send it back, wouldn't we? There would have to be a new determination of penalty, Your Honor, yes. Mr. Swinton, are we reviewing the MSPB's final order or the initial decision, or both? How does that work? Well, the final order did not petition for review and made the initial decision the final decision. The final order also provides ample discussions of the issues. So we've treated this as a discussion of both of them, Your Honor. They are consistent. There was no overturning anything in the full court decision over the initial decision. The MSPB decisions identify a lot of different bases to articulate why this offense is serious, right? In the initial decision, there's a reference to criminal acts, but then there's the violation of bylaws, condition of employment, and then there's the trust of the community. Yes, Your Honor. Could you talk about that a little bit? Sure, Your Honor. I can give you a list of citation pages for when that arises. It's strewn throughout the testimony for the hearing. It can be seen at JA 37, 36, 41, 53, 54, and 55. And to sum up all of those without having to read all that to you, Your Honors, is simply that the Pawnee Service Unit that provides the health care to the Pawnee Nation is there with – they have the trust of the community. They have the trust of the tribal leaders. If they somehow break that trust, there's fear and there's concern on the part of IHS that individuals will stop using the clinic and stop getting these services that are necessary. Because there was no awareness in the community of this problem, right? That's correct, Your Honor. And Dr. Gellman's argument is basically that, well, look, no one found out about this, so all this harm is speculative. We don't have to worry about there being newspapers or there being lawsuits discussing this matter because it hasn't happened yet. That's akin to saying I shouldn't be punished because I didn't get caught. If I had shown up today having loose-bossed my license yesterday, Your Honor – It depends on how much you should be punished, doesn't it? It could be a factor. One of the other factors is what kind of punishment would be reasonable. But here we're talking about the Douglas factor and abuse of discretion. What is grossly disproportionate in terms of a punishment? Here we don't have a situation where removal is grossly disproportionate. Dr. Gellman violated the law. We still do contend that today, Your Honor, that he did violate the law, that he violated the bylaws, he jeopardized the trust of the community, and that information could still get out to the community. I mean, this is a public action right here. Somebody could read about it and learn that there was somebody who was practicing medicine that day. Well, in fact, if this Oklahoma law actually applied in a manner that would cause Dr. Gumbs' license not to have lapsed, then everything about this case would be wrong. We wouldn't be talking about the penalty. We would be talking about the fact that he couldn't sustain the actual charges, right? If under this Oklahoma law, his license, in fact, had not lapsed, but was rather not deemed lapsed until he got a final word on non-renewal, this would have nothing to do with penalty. This would have everything to do with sustainability of the charges, wouldn't it? Well, yes. I mean, Your Honor, that wasn't brought up below. So there's substantial evidence that's still in the records for the board to find that Dr. Gumbs did practice medicine under the law. So under the standard, yes, there would be a problem for Dr. Gumbs because it wasn't raised below. But here, I understand what Your Honor is saying. You know, something maybe the agency should consider itself at that point, outside of the context of litigation, as whether Dr. Gumbs actually did violate the law. But as I discussed earlier, he was on insufficient application. So all these concerns of this court need not worry about. One other thing I wanted to mention about the distinction between the last time and this time that Dr. Gumbs' license expired. And the penalty before, there was no charges brought against him the first time. What's the difference here? The difference here is that he came into work that morning, and he met with Nurse Parrish, which was his live-in companion. And he went to go see patients while she checked, to see if his license had been renewed or not. And that's JA 76 and 75, Ms. Parrish's testimony. So he chose, made the choice to go see patients while somebody else checked to see if his license had been renewed or not. It was only at that point that Ms. Choate saw Ms. Parrish, asked, found out the license had not been renewed, and communicated that information to the supervisor, Dr. Gumbs. So he didn't know that the license hadn't been renewed? He had no reason to believe that it would be renewed, Your Honor. It was successfully expired at midnight, May 7th. And instead of checking to see if his license was valid, he went and practiced medicine. So there is a distinction here. He did go, and he went and practiced medicine while somebody else looked for him. He attempts to shift the blame to Dr. Sanders. Why didn't Dr. Sanders stop him? Dr. Sanders was only made aware of after Dr. Gumbs had visited one patient, prescribed medicine, diagnosed the patient. It was only at that point that Dr. Sanders learned. And Dr. Sanders had previously been operating under a statement from Dr. Gumbs on JA 834 that Dr. Gumbs told Dr. Sanders that he would have everything in order by May 8th. And that's what Dr. Sanders relied upon. The Court has no further questions. We received 100 bucks from the Court in front of the Senior Board. Thank you, Mr. Gumbs. So, Mr. Lutz, how about the $100? You know, I would say that if you look at the detailed recitation of all the efforts he went through to get his online license renewed for the new process in Puerto Rico, all of which is in the record, I think, the process that he walked through, you will see that he had completed all the paperwork that is eligible for renewal, that he had attempted to submit the payments online and, for some reason, that hadn't gone through as planned. The timing of whether it was substantially complete, I don't know. Mr. Grimaldi said the license was being held up because he didn't make payments. Is that accurate? I do not believe at that point that is accurate, no. I believe that at that point he had done everything that was required of him. I thought he testified that he had to pay extra money, that Puerto Rico requested extra money, and that's what he ultimately did and then was able to ultimately get his license. It was my understanding. I apologize to the Court for not having better command of the case that I am relying upon here, but my understanding was that that happened prior to the incident, not after. It may have caused a delay, certainly, but in terms of the timing and the fact that his license was actually issued just six days later, the renewal was, my understanding was it happened prior to that. I will clarify that to the Court. Can you send us a letter of clarification? Yes, I will do that. If I may interrupt. You can't interrupt. Why don't both counsel get together and advise us as to what the record shows about whether he had made the required payment or not. I shall certainly do that, Your Honor. Thank you very much. Okay. Thank you, Mr. Lewis. Thank both counsels.